

FILED
Jan 25 2018, 9:38 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Robert J. Palmer
May Oberfell Lorber
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Joanne M. Kolbe
Law Offices of Joanne M. Kolbe
Warsaw, Indiana

David W. Stone, IV
Stone Law Office & Legal
Research
Anderson, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Amanda Wills,<br>*Appellant-Respondent,*<br><br>v.<br><br>Jeremy Gregory,<br>*Appellee-Petitioner.* | January 25, 2018<br><br>Court of Appeals Case No.<br>50A03-1706-JP-1477<br><br>Appeal from the Marshall Circuit Court<br><br>The Honorable A. Christopher Lee, Special Judge<br><br>Trial Court Cause No.<br>50C01-0905-JP-46 |

**Mathias, Judge.**

Jeremy Gregory ("Father") petitioned the trial court for a modification of physical custody of his daughter after her mother Amanda Wills ("Mother") suffered a stroke. The court found that Mother's stroke was a substantial and continuing change in circumstances and that modification was in the daughter's best interests. On appeal, Mother concedes that her stroke was a substantial and continuing change but argues that the court erred when it found that the modification was in her daughter's best interests.

We affirm.

## Facts and Procedural History[1]

The facts most favorable to the trial court's judgment show that Mother gave birth to a daughter, C.G. ("Child"), in April 2009. Father established paternity in March 2010 and entered into an agreed paternity order with Mother. The order granted Mother primary physical custody of Child, with Father exercising parenting time every other weekend and on Wednesdays from after school until 7:00 p.m. Mother and Father shared joint legal custody of Child. Mother has lived alone with Child and has been Child's primary caregiver since birth. Since 2011, Father has lived with his fiancée Valerie Lozano ("Valerie"), their son, and his soon-to-be step-son.

---

[1] We remind Mother's counsel that the statement of facts in an appellate brief should be stated in accordance with the appropriate standard of review as required by Indiana Appellate Rule 46(6)(b).

[4] In October 2013, Mother suffered a stroke and was hospitalized for a little over two months. During this time, Child stayed primarily with Mother's mother, Linda Piper ("Linda"). Father did not learn of Mother's stroke until a month after it happened, and he was denied the right to take care of Child during Mother's hospitalization by Linda, except for his normal every other weekend and Wednesday evenings. Mother was unable to care for Child on her own for five to six months.

[5] As a result of the stroke, Mother has "some disabilities," including aphasia and apraxia. Tr. p. 9–10. Aphasia "affects [Mother's] ability to express herself." *Id.* at 210. And apraxia impacts her motor programming. "So when [Mother] wants to say a word, the brain sends a signal, but it sends the incorrect signal. So she either gets completely blocked on the word and can't get anything out or she will misfire and produce the wrong sound for a word." *Id.* at 211.

[6] Since Mother's stroke, Father's communications concerning Child have taken place primarily through Linda and Mother's sister. Throughout 2014 and 2015, Mother and Father had several disagreements about scheduling and which version of the Indiana Parenting Time Guidelines should be followed. Father's frustrations resulted in a meeting in July 2015 between Father, Mother, Valerie, Linda, and Mother's sister and brother-in-law. After the meeting, the visitation issues were resolved for "about three months," only to continue again. *Id.* at 57. A second meeting took place between Father, Mother, Valerie and Linda; however, it did not result in any meaningful changes.

[7]     On April 13, 2016, Father signed a petition to modify physical custody.[2] Father's petition asserted "that there have been substantial and continuing changes of circumstances prompting a modification of custody of [Child]." Appellee's App. p. 4. On April 18, Mother filed a petition asking the trial court to clarify parenting time and which set of the Indiana Parenting Time Guidelines the parents should follow. The trial court set an evidentiary hearing on the motions for December 8.

[8]     During the hearing, the trial court heard testimony from Mother, Father, Valerie, Linda, Linda's friend on behalf of Mother, Mother's co-worker, and Jennifer Essig ("Essig")—the clinical supervisor who oversaw Mother's speech therapy after the stroke. After the hearing, the trial court granted Father's petition and awarded him primary physical custody of Child. The court found that a substantial and continuing change in circumstances had occurred, warranting modification. The court stated, "Specifically, the Mother suffered a stroke approximately three years ago impacting her physical health- including her ability to communicate. As a result, the Mother's ability to serve as the primary physical custodian has been adversely impacted." Appellant's App. p. 9. The court also found that it was in Child's best interests for Father to have primary physical custody. Mother was granted parenting time according to the

---

[2] Although the petition was signed on April 13, it was not filed until April 19. Appellee's App. p. 4. Father was also asked why he waited over two years after Mother's stroke to seek a modification of custody. He stated that he saw how much Child was hurting with Mother in the hospital, and "[t]he last thing I wanted to do was add to that situation, add to the difficulty of the situation." Tr. pp. 50–51.

2017 Indiana Parenting Time Guidelines, and Mother and Father would continue to share legal custody.

[9] Mother now appeals.

## Discussion and Decision

[10] Mother contends that the trial court erred when it granted Father primary physical custody of Child. We review custody modifications for an abuse of discretion, granting latitude and deference to the trial court. *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). "We set aside judgments only when they are clearly erroneous, and will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment." *Id.* (citations omitted). There is a well-established preference in Indiana for granting significant latitude and deference to our trial judges in family law matters. *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *Kirk*, 770 N.E.2d at 307. Therefore, on appeal we "are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011).

[11] Indiana Code section 31-14-13-6 provides that a trial court may not modify an existing custody order unless (1) the modification is in the best interests of the

child, and (2) there has been a substantial change in one or more statutory factors that are outlined in Indiana Code section 31-17-2-8. The factors a trial court is to consider under Section 31-17-2-8 are:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;
>>
>> (B) the child's sibling; and
>>
>> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
>> (A) home;
>>
>> (B) school; and
>>
>> (C) community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.
>
> (8) Evidence that the child has been cared for by a de facto custodian . . . .

[12] When interpreting Section 31-17-2-21, our court has held that all that is required to support custody modification is a finding by the trial court that (1) change would be in the child's best interests, (2) a consideration of the factors listed above, and (3) a finding that there has been a substantial change in one of those factors. *In re Paternity of P.R.*, 940 N.E.2d 346, 351 (Ind. Ct. App. 2010) (citation omitted). Here, neither party requested special findings under Indiana

Trial Rule 52(A); however, the trial court entered abbreviated findings and conclusions sua sponte. "As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). We review any remaining issues under the general judgment standard, where the judgment will be affirmed if it can be sustained on any legal theory consistent with the evidence. *Id.*

[13]    The trial court explained in its order:

> There has been a substantial and continuing change in circumstances in the factors set forth in I.C. 31-17-2-8 warranting a modification. Specifically, the Mother suffered a stroke approximately three years ago impacting her physical health-including her ability to communicate. As a result, the Mother's ability to serve as the primary physical custodian has been adversely impacted.

Appellant's App. p. 9. The trial court then stated, "It is in [Child's] best interest for primary physical custody to change from her Mother to her Father." *Id.* at 10. Mother concedes that her stroke was a "substantial change in circumstances"; however, she contends that the change "has not adversely affected [Mother's] ability to be the primary physical custodian," and that custody modification is not in the best interests of Child. Appellant's Br. at 15. We disagree.

Father noted three issues when he was asked about his specific concerns that led to requesting a modification: (1) communication with Mother, (2) Child's schoolwork, and (3) Child's hygiene.

Regarding communication, Father stated that he cannot communicate directly with Mother and had to talk to Linda or Mother's sister about Child. Mother acknowledged that she would rely on Linda and her sister to help when she needed to communicate complex issues with Father or with Child's school about Child. Mother and Father communicated primarily via text messages.

During the hearing, Linda explained her role in communicating with Father: "[I]f it's text and [Mother] can just verbally say yes, or no, or okay, she does it, but if it's a long sentence or a paragraph, no that's me [typing]." Tr. at 178–79. Linda further said that Mother can write out more than a couple of sentences, but Mother might need help depending on "how complicated the words are . . . . She cannot get long continuity words out." *Id*. at 180.

Essig also explained how the stroke affected Mother:

> She has word finding difficulties, cannot communicate in long full sentences. It also can affect her ability to read and write, and then some auditory comprehension.

***

> And then the apraxia component is an oral or a motor programming piece. So when she wants to say a word, the brain sends a signal, but it sends the incorrect signal. So she either gets completely blocked on the word and can't get anything out or she

will misfire and produce the wrong sound for a word. So instead of saying scissors, she might say ditters.

*Id.* at 210–11. Essig further noted that a goal for Mother would be to "get her back into the workplace in some capacity." *Id.* at 211. She also testified that Mother is currently reading at "paragraph level" and that she is hopeful Mother will one day get to a point where she can read a book of a complex nature. *Id.* at 212.

[18] The following excerpt from Mother's testimony illustrates Father's concern regarding communication:

| | |
|---|---|
| [Counsel]: | Did the stroke affect your ability to understand the words that you need to use to communicate? |
| [Mother]: | Probably. |
| [Counsel]: | Okay. Do you have a hard time understanding things that you read? |
| [Mother]: | Yes. |
| [Counsel]: | Do you have a hard time understanding the things that you hear? |
| [Mother]: | No. |
| [Counsel]: | Okay. So as I'm asking you questions -- |
| [Mother]: | Yeah. |
| [Counsel]: | -- you have understood the words that I've used? |
| [Mother]: | Yes. |
| [Counsel]: | Okay. Do you have a hard time finding the right words to answer the questions? |
| [Mother]: | Yes. |
| [Counsel]: | So that makes it difficult for you to communicate; is that right? |
| [Mother]: | I know what you said, but I don't – [Child] is fine. |

>                  [Counsel]:   That wasn't my question. My question is did the
>                               stroke cause you to have a difficulty
>                               communicating?
>                  [Mother]:    Sometimes.

*Id.* at 11. Later in the hearing, Father directly expressed his concerns:

>                  [Counsel]:   Okay. In terms of the ability that [Mother] has to
>                               communicate with you about [Child], do you have
>                               concerns that it has started to include [Child] more?
>                  [Father]:    Yes, I've -- since the stroke, I have seen where
>                               [Child] has been put in the situation where she's got
>                               to try to communicate stuff with me, where most of
>                               the communication needs to occur through [Child].
>                               And she's seven years old. That burden should not
>                               fall on her.

*Id.* at 76.

[19]   Father was also concerned about Child's schoolwork: "I have seen [Child's]
       inability to comprehend her school work. I have also noticed her grades not
       being the best, and I know her ability is way more than what is perceived . . . ."
       *Id.* at 51. Father was worried that despite Mother's best efforts, she was unable
       to help Child with her homework, and Child's homework would only get more
       complex as she got older. Father explained that at his house, they sit down
       every night as a family and do homework. He excelled in math while Valerie
       excelled in reading and language arts, so the two "switch hit to make sure that
       the kids get the best possible help they can." *Id.* at 54. When asked about
       helping Child with schoolwork, Mother testified:

>                  [Counsel]:   Did [Child] receive tutoring services for first grade?

| | |
|---|---|
| [Mother]: | First grade -- first grade I have -- I didn't talk, so I got a tutor. |
| [Counsel]: | Okay. Was that -- |
| [Mother]: | It's my fault, but she doesn't -- |
| [Counsel]: | Who is she? |
| [Mother]: | [Child]. |
| [Counsel]: | [Child] doesn't what? |
| [Mother]: | She go -- I mean, not that, but -- she doesn't need a tutor, but I can't do the words. |
| [Counsel]: | You can do the what? |
| [Mother]: | Spell the words. |
| [Counsel]: | [Child] did not need a tutor, but she had one? |
| [Mother]: | For -- because of me. I can't do the words. |

***

| | |
|---|---|
| [Counsel]: | Okay. At [the time of the stroke] was [Child] in school? |
| [Mother]: | No. Well, the pre -- she was four. They had that preschool thing. |
| [Counsel]: | When did she start kindergarten? |
| [Mother]: | Four -- I mean five. |
| [Counsel]: | So was that -- in the fall of what year? |
| [Mother]: | It -- I don't know. I can't know number this. |
| [Counsel]: | Okay. You have difficulty with numbers? |
| [Mother]: | Yes. |
| [Counsel]: | Okay. Is math a part of [Child's] curriculum at school? |
| [Mother]: | Yes. |

*Id.* at 13, 15.

[20]    Child was in pre-school when Mother suffered her stroke. At the time of the hearing, Child was in second grade. As Child progressed through school, she

struggled with reading and math concepts. For example, during the first grading period of first grade, she received grades of "needs improvement" in nine out of eleven concepts. Ex. Vol., Respondent Ex. A. As a result, Mother found a tutor for Child, and Child's grades in reading improved to "mastery" or "exceeds mastery" by the end of the school year. *Id.* At the end of first grade, Child's math grades ranged from "needs improvement" to "exceeds mastery." *Id.*

Mother decided not to keep Child in tutoring for second grade. Child's second-grade report card included only grades from the first grading period; it reflected that Child had "mastery" over all reading and math concepts but that she "need[ed] improvement" in all writing concepts. Ex. Vol., Respondent Ex. B. Child's second-grade report card also indicated Child's beginning of year NWEA RIT Scores[3] in Reading, Language Usage, and Math. Child scored below the national average on all three assessments.

Father expressed his concern with Child's academic progress during the hearing:

> [Counsel]: Is it possible for [Child's] needs to be met, in your estimation, given the present circumstances that exist if she stayed with her mother?
>
> [Father]: I don't think so. Schoolwork is going to get more complex. There's going to be a lot more going on as

---

[3] The NWEA is a standardized adaptive assessment used by schools and school districts across the country to measure student achievement and growth independent of grade level. *2015 NWEA Measures of Academic Progress Normative Data*, https://www.nwea.org/content/uploads/2015/06/2015-MAP-Normative-Data-AUG15.pdf (last visited Dec. 15, 2017). The RIT score allows educators to see where a student is academically in Reading, Language Usage, and Math at a given point in time. *Id.*

far as school activities, needs academically that are going to be met, and if there's already a struggle at first and second grade level, I can't see that it's going to get any better.

I mean to have this much trouble and need for outside assistance now, I don't see how adding multiplication and adding other stuff like that is going to help the situation. I believe it will hinder it, and it's nothing I wish upon anyone, but I just -- I don't -- I don't think her needs can be met in the current situation.

[Counsel]: Since the stroke, have you seen any improvement in [Mother's] ability to meet [Child's] academic needs?

[Father]: I have noticed a lot more effort put forward. As far as being able to meet the needs, I'm sorry, I cannot honestly say yes to that question.

*Id.* at 75.

[23] Father also expressed concerns about Child's hygiene while in Mother's care.

When asked about Child's hygiene, Mother testified:

[Counsel]: Do you assist [Child] with her hygiene?

[Mother]: Yes.

[Counsel]: What do you --

[Mother]: She -- she doesn't like bath, so I make her take a bath probably one -- two months -- no. She don't like bath.

[Counsel]: Do you help her with her bath?

[Mother]: Yes.

[Counsel]: Do you physically assist her with her bathing?

[Mother]: What do you mean? No, she do it, but I watch her.

*Id.* at 35–36. Father identified several specific examples signifying his concern with Child's hygiene. Child has suffered from a rash on her backside since she was an infant, and Father explained that Child has shown up on Friday for weekend visits with significant irritation. However, by the time Child leaves on Sunday, the rash has cleared up based on consistently applying a proper ointment. When asked if Father believes Mother applies ointment to Child's behind at home he testified, "I certainly do not think she does the required hygiene." *Id.* at 112. When asked about the ointment for Child, Mother stated:

| [Counsel]: | And do you know what the name of the ointment is for her rash? |
|---|---|
| [Mother]: | No. |
| [Counsel]: | Is that prescribed or is it over-the-counter? |
| [Mother]: | You -- I don't know what -- how the -- it can't -- yes, you can, but counter they have that. No, no, no. You get -- you can go get it. |

*Id.* at 44.

[24] On one occasion when Father picked Child up from school, she had gum in her hair that "look[ed] to have been there for an extended amount of time." *Id.* at 124; *see also* Ex. Vol., Petitioner's Exs. 3-F, 3-I, 3-L. Father also indicated that Child was typically sent to his home in stained clothing. Ex. Vol., Petitioner Ex. 3-G. Additionally, Child would show up to Father's home with "very red, irritated, and very chapped" ears. Tr. p. 125; *see also* Ex. Vol., Petitioner's Exs. 3-H, 3-J, 3-N. On another occasion, Father picked Child up from school and noticed a foul smell coming from her backpack. When Father opened the

backpack, he found urine stained clothes that appeared partly dried. Ex. Vol., Petitioner's Ex. 3-K.

[25] Viewing the facts most favorable to the judgment, Father's concerns regarding communication with Mother, Child's academic progress, and Child's hygiene provided the trial court with sufficient probative evidence to conclude that Mother's ability to serve as the primary physical custodian of Child had been adversely impacted because of her stroke. We cannot conclude that the trial court erred in this determination.

[26] Mother also lists several reasons to support her argument that the trial court erred when it found custody modification was in the Child's best interest including that: (1) Child will be forced to live in the home of a person with whom she has never lived; (2) Child will move from a two-person household into a five-person household; (3) Child will be forced to change school systems; (4) Child will be cared for during the summer by Father's fiancée's mother, with whom she does not have a relationship; and (5) Child will be moved to a home where physical discipline is used. Appellant's Br. at 17–18.

[27] While we recognize Mother's valid concerns, we find their potential effect on Child overstated. Mother and Father have shared joint custody of Child since 2010, and Child stays with Father on Wednesday evenings, every other weekend, and certain holidays. Father testified at the hearing:

> Every night - - [Child] is only with me on Wednesdays, but every night we sit down as a family, my fiancé[e] Valerie, my [soon-to-be step-] son Alex, and [Child], and myself, we do homework.

> Valerie accelerates [sic] in reading and language arts, if you call it. I excel in Math. So we kind of switch hit to make sure that the kids get the best possible help they can.

Tr. p. 54. Father also explained that Child has her own room at his house, and the children have a swing set and a large fenced-in back yard. Child is not entering a house full of strangers as Mother contends, but rather Child calls Valerie "momma," and the two have a close relationship. *Id.* at 140. Additionally, Father has already spoken with the new school district about Child possibly attending school there. Moreover, the school district is where Child's soon-to-be step-brother currently attends, and Father described it as a "great school district." *Id.* at 74.

[28] Further, there is no evidence to support Mother's contention that Child has no relationship with Valerie's mother, who would be taking care of the children during the summer when Father and Valerie are at work. Instead, the record is silent on her relationship with Child, and it indicates that Valerie's mother is a special needs teacher at the school where Child would attend. With regard to physical discipline, Father testified that he spanks Child "when she gets out of control," but he had not done so in over a year. *Id.* at 108.

[29] We also note that during the hearing, Father expressed his compassion for Mother's current situation and his willingness to work with Mother in raising Child going forward:

> [Counsel]: You have shared with me empathy and tremendous sorrow really over [Mother's] circumstances.

[Father]: Yes.

[Counsel]: So let us now talk pointedly about what impact a change in custody would have upon [Child] as it would obviously impact [Mother] if she no longer had custody of your daughter.

[Father]: I would -- if anything were to happen, I would allow everything that is in the Guidelines and more. I -- from the beginning of [Mother] being pregnant it has been us. It has been [Mother], [Child], and I. And even though there's another party, Valerie Lozano involved, we still got to be a core team. And I would never do anything to jeopardize that, and I would want her there every step of the way, because I know how important it is to [Child].

*Id.* at 74–75. Father also indicated that a fixed schedule for Child would mirror the Indiana Parenting Guidelines, and that he would ensure that Mother would have more time with Child than Father currently does. *Id.* at 78.

[30] For us to conclude that the trial court erred in concluding a modification in custody was in Child's best interests, we would need to reweigh evidence, view disputed facts in a light unfavorable to the judgment, and place ourselves in the position of the trier of fact, roles that are inappropriate on appeal. *See Steele-Giri*, 51 N.E.3d at 124. Probative evidence supports the trial court's findings that it is in Child's best interests for physical custody to change to Father.

## Conclusion

[31] Based on the facts and circumstances before us, we cannot say that the trial court erred when it concluded that there has been a substantial change in circumstances that have adversely affected Mother's ability to be the primary

custodian of Child and that modification of physical custody is in Child's best interests. Mindful of the substantial deference we accord our trial courts in family law matters, the trial court here has not abused its discretion. Accordingly, we affirm.

Crone, J., concurs.

Vaidik, C.J., dissents with opinion.

ATTORNEY FOR APPELLANT

Robert J. Palmer
May Oberfell Lorber
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Joanne M. Kolbe
Law Offices of Joanne M. Kolbe
Warsaw, Indiana

David W. Stone, IV
Stone Law Office & Legal
Research
Anderson, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Amanda Wills,<br>*Appellant-Respondent,*<br><br>v.<br><br>Jeremy Gregory,<br>*Appellee-Petitioner.* | January 25, 2018<br><br>Court of Appeals Case No.<br>50A03-1706-JP-1477<br><br>Appeal from the Marshall Circuit<br>Court<br><br>The Honorable A. Christopher<br>Lee, Special Judge<br><br>Trial Court Cause No.<br>50C01-0905-JP-46 |

**Vaidik, Chief Judge, dissenting.**

[32] Disability of a parent alone is not sufficient to justify a change in physical custody; the disability must adversely affect the child such that modification of custody is in the child's best interests. Here, the trial court changed physical

custody of Child based solely on Mother's ability to communicate without any evidence that it negatively impacted Child. Accordingly, I dissent.

[33] Mother suffered a stroke in 2013 and, as a result, had difficulty communicating verbally. Mother's intelligence, however, was not affected by the stroke. She faithfully attended speech therapy, both individual and group sessions, and progressed from being able to utter a single word to speaking in full sentences. Mother accomplished every therapy goal, and each goal has been for Child's benefit. Almost three years after Mother's stroke, Father—for the first time—petitioned for a custody modification. The trial court granted Father's petition, citing in its order Mother's communication issues as the reason for transferring primary custody to Father. Mother's communication issues can be separated into two categories: 1) Mother and Father's miscommunications with one another and 2) Mother's communication with Child.

[34] Regarding the parents' communication problems, they are caused by hurdles faced by many separated parents and revolve mainly around the parenting-time schedule. Mother and Father argued over which version of the Indiana Parenting Time Guidelines governed their parenting-time schedule. Father believed that he and Mother had informally agreed to use the 2013 Guidelines (which would give him additional parenting time), but Mother believed that the 2008 Guidelines governed because of the paternity order (the only order issued by the court before their dispute). Because of this ongoing feud, Mother asked the trial court to clarify which Guidelines governed. Despite these arguments, Father continued to exercise regular parenting time with Child. Nothing in the

record suggests that the communication issues between the parents have adversely affected Child.

[35] As for Mother's communication issues with Child, Father argued that Child has and will continue to suffer in school because of Mother's inability to help Child with her school work. Father claims that he and his live-in fiancée are better able to help Child with her homework. In first grade, Child received grades indicating that she "need[ed] improvement" in some subjects. Resp't's Ex. A. Mother promptly hired a tutor, and Child's grades improved. It is true that Mother did not keep Child in tutoring for second grade, but Mother was never asked about this decision. All we know is that after one grading period, Child was struggling in only one area: writing. When Child was in first grade, Mother hired a tutor after two grading periods were completed. There is nothing to indicate that Mother will not do the same thing should Child's writing grade not improve or her other grades begin to fall. Mother has shown that she can, and will, take the necessary actions to ensure Child's academic success.

[36] Father also expressed concern that Child had been "put in the situation where she's got to try and communicate stuff with me" for Mother. Tr. Vol. II, p. 76. But only one instance was discussed where this actually occurred: a dispute over which parent had Child for fall break. Father stated that during the argument Mother would look to Child to help her find the right words. But Essig, Mother's speech therapist, explained that it is normal for anyone to fill in the pause in communication to move the conversation along. Essig speculated

that when Child is with Mother, Child most likely picks up on the "pause being slightly awkward and want[s] to help move [Mother] on to the next word[.]" *Id.* at 215. And even if Father is correct and Mother relied on Child to help her during this argument, it was an isolated occurrence and does not rise to the level of negatively impacting Child such that modification of custody is in her best interests.

[37] All the other reasons relied upon by the majority to affirm the trial court (but not cited by the trial court itself) do not justify a modification of custody. One-time occurrences of gum in Child's hair and soiled clothes do not support a custody change. Nor do a rash that Mother has had seen by a dermatologist, chapped ears that were the result of Child's earrings, or clothes stained after spending the day at school. These are simply byproducts of living the life of a seven-year-old.

[38] No one testified that Mother was not a good mother. In fact, two witnesses testified that they had no concerns about Mother's parenting. *See id.* at 173, 193. Many parents suffer from disabilities but are good parents. Mother is one. She owns her own home in Plymouth, where she and Child have lived since Child was born. Mother pays her bills, provides food and clothing for Child, and maintains a clean home without any help from others. She has provided a lifetime of stability for Child. Child attends a good school, and every morning Mother puts Child on the school bus and greets Child at the bus at the end of the school day. Child had almost perfect attendance in first and second grade. Additionally, Mother has enrolled Child in extracurricular activities.

[39] Furthermore, no custody evaluation was done; no teacher testified; no Guardian Ad Litem report was ordered. What is in Child's best interests was solely determined from the testimony at the custody hearing. Child has grown up living near her grandmother and aunt, and she sees them often. At Father's home, Child will attend a school that we know nothing about other than Father's claim that it is a "great school district." *Id.* at 74. After school and during extended breaks from school, Child will be at home with a babysitter, as Father and his fiancée both work. Both Father and his fiancée stated that the babysitter would be fiancée's mother, but she did not testify. As the majority notes, the record is completely silent on what kind of relationship Child has with the fiancée's mother.

[40] I understand that this Court is to be deferential to the trial court in child-custody matters and that we grant this deference because the trial court sees and hears the witnesses. Here, undoubtedly, the trial court had the advantage of seeing and hearing Mother testify. But the evidence must show that the change in circumstances adversely affected Child such that modification is in Child's bests interests. There was no such evidence here. Just as it is improper to modify custody based on arbitrary changes (e.g. parent's income level), it is improper for the trial court to modify custody based solely on a parent's disability without any showing as to how that disability negatively impacts the Child. Today's decision creates unnecessary anxiety for good parents who also happen to have a disability. I firmly believe that, in this case, it was a mistake to modify primary custody from Mother to Father.